1

2

3

4

5

6

7                         UNITED STATES DISTRICT COURT

8                         EASTERN DISTRICT OF CALIFORNIA

9

10   THEODORE ROSE, individually and as         No.  2:13-cv-01339-TLN-EFB
     joint successor-in-interest to Decedent
11   JOHNATHAN ROSE; KAREN ROSE,
     individually and as joint successor-in-
12   interest to Decedent JOHNATHAN ROSE;       **ORDER**
     THE ESTATE OF JOHNATHAN ROSE,
13
                        Plaintiffs,
14
            v.
15
     COUNTY OF SACRAMENTO; SCOTT
16   JONES, in his official capacity as
     SHERIFF for the SACRAMENTO
17   COUNTY SHERIFF'S DEPARTMENT;
     DAVID McENTIRE; DOES 1-10,
18   inclusive,
19                      Defendants.

20

21          This matter is before the Court pursuant to Defendants County of Sacramento, Sheriff

22   Scott Jones, and Deputy David McEntire's (collectively referred to as "Defendants") motion for

23   summary judgment.  (ECF No. 24.)  Plaintiffs Theodore Rose and Karen Rose, both as

24   individuals and as joint successors-in-interest to the Estate of Johnathan Rose (collectively

25   referred to as "Plaintiffs") oppose Defendants' motion.  (ECF No. 27.)  Defendants have filed a

26   reply to Plaintiffs' opposition.  (ECF No. 34.)  The Court has carefully considered the briefings

27   filed by both parties.  For the reasons set forth below, Defendants' motion for summary judgment

28   (ECF No. 24) is hereby GRANTED IN PART AND DENIED IN PART.

                                          1

## I.   FACTUAL BACKGROUND

Decedent Johnathan Rose ("Johnathan") was a 24 year old male diagnosed with paranoid schizophrenia and obsessive compulsive disorders and frequently exhibited behavior consistent with these conditions.  (Complaint, ECF No. 1 at ¶ 16.)  Johnathan was 6 feet tall and weighed about 215 pounds.  (Compl. at ¶ 17.)  Johnathan was prescribed psychotropic medications and received regular psychiatric care while he lived at home with his family, who helped care for him.  (Compl. at ¶ 18.)  On the evening of January 17, 2012, Johnathan's father, Plaintiff Theodore Rose ("Ted Rose") called 911 and requested officer assistance in administering medication to his son.  (Compl. at ¶¶ 20–22.)  Ted Rose communicated to the 911 dispatch operator that his son was mentally ill and that the call was potentially a Section 5150 call, a type of shorthand used to indicate that the subject of the call suffers from a mental illness and may pose a danger to himself or others.  (Mem. in Supp. of Defs.' Mot. for Summ. J., ECF No. 24-1 at 2 and ECF No. 27 at 2.)  Defendant Deputy David McEntire ("Deputy McEntire") responded to the call.  Defendants state, and Plaintiffs do not dispute, that Deputy McEntire was not dispatched to the call for nearly 40 minutes.  (ECF No. 24-1 at 2.)

From this point forward, the parties' descriptions of events vary widely.  Plaintiffs maintain that, during the time between the call and Deputy McEntire's arrival, Johnathan took his medication and went to sleep.  (ECF No. 27 at 2.)  Plaintiffs allege that, at the time Deputy McEntire arrived at their home, Johnathan was asleep in his bed.  (ECF No. 27 at 2.)  Plaintiffs further allege that, when Deputy McEntire arrived, he "brushed by" Ted Rose, who answered the door, and approached the bed where Johnathan was sleeping.  (ECF No. 27 at 2.)  Deputy McEntire woke Johnathan and ordered him to lie face down on the ground to be handcuffed.  (ECF No. 27 at 2.)  Plaintiffs then state that Johnathan refused to lie on the ground, but presented his hands to be handcuffed, and that Deputy McEntire responded by striking Johnathan on the head with his metal flashlight with such force that Johnathan received a gash on his head and partially fell through a sheet rocked wall.  (ECF No. 27 at 2.)  Plaintiffs state that an altercation ensued and that Deputy McEntire was "clearly in control and winning the fight when, without warning or provocation, he fatally shot [Johnathan] three times at point blank range."  (ECF No.

2

1    27 at 2.)

2       Alternately, Deputy McEntire alleges that as soon as he stepped into the home, he was

3 verbally challenged by Johnathan and was attacked "with unrelenting aggression" and without

4 warning or provocation.  (ECF No. 24-1 at 3.)  Defendants allege that Deputy McEntire received

5 continuous blows to the face, head, and body and began to feel that he was losing consciousness.

6 (ECF No. 24-1 at 3.)  Defendants further state that Deputy McEntire felt Johnathan grab his

7 service belt, which contained his firearm and his knife, and reacted by pulling his firearm and

8 shooting Johnathan three times.  (ECF No. 24-1 at 3.)  Both parties agree that Johnathan died

9 from these wounds.  (ECF No. 24-1 at 3 and ECF No. 27 at 2.)

10      **II.**      **LEGAL STANDARD**

11       Summary judgment is appropriate when the moving party demonstrates no genuine issue

12 as to any material fact exists, and therefore, the moving party is entitled to judgment as a matter

13 of law.  Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Under

14 summary judgment practice, the moving party always bears the initial responsibility of informing

15 the district court of the basis of its motion, and identifying those portions of "the pleadings,

16 depositions, answers to interrogatories, and admissions on file together with affidavits, if any,"

17 which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v.*

18 *Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof

19 at trial on a dispositive issue, a summary judgment motion may properly be made in reliance

20 solely on the pleadings, depositions, answers to interrogatories, and admissions on file."  *Id.* at

21 324 (internal quotations omitted).  Indeed, summary judgment should be entered against a party

22 who does not make a showing sufficient to establish the existence of an element essential to that

23 party's case, and on which that party will bear the burden of proof at trial.

24       If the moving party meets its initial responsibility, the burden then shifts to the opposing

25 party to establish that a genuine issue as to any material fact actually does exist.  *Matsushita Elec.*

26 *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities*

27 *Serv. Co.*, 391 U.S. 253, 288–89 (1968).  In attempting to establish the existence of this factual

28 dispute, the opposing party may not rely upon the denials of its pleadings, but is required to

tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 288–89. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587.

### III. ANALYSIS

On July 5, 2013, Plaintiffs filed a complaint against Defendants alleging six causes of action: 1) Excessive force/unreasonable seizure under 42 U.S.C. § 1983 against Deputy McEntire;

4

1  2) Substantive due process violation under 42 U.S.C. § 1983 against all Defendants; 3)

2  Unconstitutional practices under 42 U.S.C. § 1983 against Defendants County of Sacramento,

3  Sherriff Jones, and Does 1–5; 4) Supervisory liability for constitutional violations under 42

4  U.S.C. § 1983 against Defendant Jones and Does 1–5; 5) Wrongful death under California Code

5  of Civil Procedure Section 377.60 against all Defendants; and 6) Unreasonable search in violation

6  of the Fourth Amendment to the U.S. Constitution against Deputy McEntire.  (Compl. at ¶¶ 54–

7  83.)  Defendants move for summary judgment at to Plaintiffs' second and third causes of action.

8                    A.    Count II – Fourteenth Amendment (Loss of Familial Relations)

9           Plaintiffs bring their second cause of action against all Defendants, arguing that the acts

10  and/or omissions of Defendants caused the death of Johnathan and deprived Plaintiffs of their

11  liberty interest in their family relationships in violation of their substantive due process rights

12  under the Fourteenth Amendment to the United States Constitution.  (ECF No. 1 at ¶¶ 58–62.)

13  Plaintiffs further allege that Defendants' acts were "malicious, reckless and/or accomplished with

14  a conscious disregard of Plaintiffs' rights thereby entitling Plaintiffs to an award of exemplary

15  and punitive damages."  (ECF No. 1 at ¶ 62.)  Defendants argue that the Court must grant

16  summary judgment in its favor as to this claim because "there is no dispute that [Deputy]

17  McEntire's response to the call for service and use of force were directly related to his duty as an

18  officer and no reasonable jury could find that [he] acted with a purpose to harm Johnathan that

19  was unrelated to law enforcement objectives."  (ECF No. 24-1 at 9.)

20          The Ninth Circuit "has recognized that parents have a Fourteenth Amendment liberty

21  interest in the companionship and society of their children."  *Wilkinson v. Torres*, 610 F.3d 546,

22  554 (9th Cir. 2010).  "Official conduct that 'shocks the conscience' in depriving parents of that

23  interest is cognizable as a violation of due process." *Id.*  (citing *Porter v. Osborn*, 546 F.3d 1131,

24  1137 (9th Cir. 2008)).  In assessing whether an officer's conduct shocks the conscience, the court

25  may consider whether the officer exhibited "deliberate indifference" or, when the situation is one

26  that requires a snap judgement, whether the officer acted with "purpose to harm" the decedent.

27  *Porter*, 546 F.3d at 1137–38.  Defendants argue that the Court should apply the "purpose to

28  harm" standard in dismissing Plaintiffs' claim, stating that Deputy McEntire "was locked in a

1   violent struggle" with Johnathan as a result of his response to a call for service and that no

2   reasonable jury could find that he acted with purpose to harm.  (ECF No. 24-1 at 8–9.)  Plaintiffs

3   do not advocate for a standard, but argue that Deputy McEntire's actions would meet even the

4   more stringent purpose to harm standard.  (ECF No. 27 at 3.)

5        In assessing Plaintiffs' claim, "the court must consider the totality of the facts in order to

6   determine whether a Fourteenth Amendment violation has occurred."  *Isayeva v. Cty. of*

7   *Sacramento*, No. 2:13-CV-02015-KJM, 2015 WL 5544505, at *11 (E.D. Cal. Sept. 18, 2015).

8   Here, the Court finds a dispute of material fact as to whether Deputy McEntire had sufficient time

9   to deliberate his actions with respect to Johnathan.  Defendants motion recounts, "[w]ithin

10  second[s], without warning or provocation, the 270 pound Johnathan attacked [Deputy] McEntire

11  with unrelenting aggression."  (ECF No. 24-1 at 3.)  While Plaintiffs' opposition maintains that

12  Johnathan was sleeping when Deputy McEntire arrived, that Deputy McEntire instructed

13  Johnathan to get out of bed and lie on the ground to be handcuffed, and that, when Johnathan

14  refused to lie on the ground and instead presented his hands to be handcuffed, Deputy McEntire

15  struck him in the temple with a mental flashlight with such force that Johnathan partially fell

16  through a sheet rocked wall.  (ECF No. 27 at 2.)  The Court finds that the submitted evidence

17  creates a genuine dispute about which standard of culpability should apply in this case.  "By its

18  nature, the determination of which situation [a defendant] actually found himself in is a question

19  of fact for the jury, so long as there is sufficient evidence to support both standards."  *Duenez v.*

20  *City of Manteca*, No. CIV. S-11-1820 LKK, 2013 WL 6816375, at *14 (E.D. Cal. Dec. 23, 2013).

21  Moreover, because the parties differ so vastly in their recounting of the facts, the Court finds that

22  there is a genuine dispute as to whether Deputy McEntire acted with either deliberate indifference

23  or a purpose to harm.  For these reasons, the Court cannot grant summary judgment in

24  Defendants' favor as to Count II.

25        B.    Count III – *Monell* Claim (Unconstitutional Practices and Policies)

26        Plaintiffs bring their third cause of action against Defendants County of Sacramento,

27  Sacramento County Sheriff Scott Jones, and Does 1–5, arguing that Defendants' customs,

28  practices, and/or de facto policies were the direct and proximate cause of the violation of

1   Johnathan's civil rights.[1]  (ECF No. 1 at ¶¶ 63–67.)  Although it is not made clear in their

2   Complaint, Plaintiffs indicate that in their opposition that they intend to bring their third claim on

3   three grounds: 1) the County failed to train its deputies; 2) the County failed to supervise its

4   deputies; and 3) the County failed to investigate its deputies' uses of force.  (ECF No. 27 at 4–5.)

5   Defendants argue that this claim should be dismissed because Plaintiffs have failed to meet the

6   standard of proof for each part of their claim.   (Mem. in Supp. of Def.'s Mot. for Summ. J., ECF

7   No. 24-1 at 3; ECF No. 34 at 3–6.)  The Court agrees and grants summary judgment in favor of

8   Defendants as to Count III.

9          Under the Supreme Court's decision in *Monell v. New York City Dept. of Social Servs.*,

10   436 U.S. 658, 689–91 (1977), a government entity may be held liable under 42 U.S.C. § 1983,

11   but such liability must be founded upon evidence that the government unit itself supported a

12   violation of constitutional rights and not on the basis of the respondeat superior doctrine or

13   vicarious liability.  Municipal liability only attaches when execution of a government's policy or

14   custom inflicts the plaintiff's injury.  *Monell*, 436 U.S. at 694; *see also Bd. of Cnty. Comm'rs of*

15   *Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997).  The Ninth Circuit has held that a single

16   incident will not suffice to show a policy.  *See Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir.

17   1999).  In order to succeed, Plaintiff must show a longstanding practice or custom which

18   constitutes the standard operating procedure of the local government entity.  *See Trevino v. Gates*,

19   99 F.3d 911, 918 (9th Cir. 1996).  "The custom must be so 'persistent and widespread' that it

20   constitutes a permanent and well settled city policy."  *Id.* (quoting *Monell*, 436 U.S. at 691).

21   "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be

22   founded upon practices of sufficient duration, frequency and consistency that the conduct has

23   ---

24   [1] A claim against a state or municipal official in her official capacity is treated as a claim against the entity itself.  *See*
*Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  The Supreme Court has stated that an official capacity claim is
simply "'another way of pleading an action against an entity of which an officer is an agent.'  As long as the

25   government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than
name, to be treated as a suit against the entity."  *Id.* at 165–66 (quoting *Monell*, 436 U.S. at 690 n.55).  Therefore,

26   when a § 1983 complaint asserts a claim against a municipal entity and municipal official in her official capacity,
federal district courts routinely dismiss the official capacity claim as duplicative or redundant.  *See, e.g., Cotton v.*
*District of Columbia*, 421 F. Supp. 2d 83, 86 (D.D.C. 2006); *Baines v. Masiello*, 288 F . Supp. 2d 376, 384

27   (W.D.N.Y. 2003); *McCachren v. Blacklick Valley Sch. Dist.*, 217 F. Supp. 2d 594, 599 (W.D. Pa. 2002).  Plaintiffs
have not provided this Court with any reason that these claims are not redundant, thus the Court finds it appropriate

28   to dismiss the claims against Sheriff Jones.

1    become a traditional method of carrying out policy." *Id.*

2                             i.       *Failure to Train*

3              Plaintiffs argue that the Sacramento County Sheriff's Department did not provide patrol

4    officers with any post-academy training specific to dealing with mentally-ill individuals prior to

5    the incident with Johnathan.  (ECF No. 27 at 5.)  Plaintiffs further allege that Deputy McEntire

6    specifically did not receive any training on how to deal with mentally ill members of the

7    community and this lack of training was the moving force behind the violations suffered by

8    Plaintiffs.  (ECF No. 27 at 5.)  Plaintiffs cite to sources within the record to support these

9    assertions, but still their analysis falls short of creating a viable legal question.

10             In *City of Canton v. Harris*, 489 U.S. 378, 380 (1989), the Supreme Court held that

11   deliberately indifferent training may give rise to § 1983 municipal liability.  However, it limited

12   liability to instances "only where the failure to train amounts to deliberate indifference to the

13   rights of persons with whom the police come in contact," and that deliberate indifference was the

14   moving force of the violation of the plaintiff's federally protected right.  *Id.* at 388.  Therefore,

15   "only where a municipality's failure to train its employees in a relevant respect evidences a

16   'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly

17   thought of as a city 'policy or custom' that is actionable under § 1983."  *Id.* at 389.  To succeed,

18   the plaintiff must demonstrate specific training deficiencies and either (1) a pattern of

19   constitutional violations of which policy-making officials can be charged with knowledge, or (2)

20   that training is obviously necessary to avoid constitutional violations, e.g., training on the

21   constitutional limits on a police officer's use of deadly force.  *Id.* at 390–91.  Neither negligent

22   nor even grossly negligent training by itself gives rise to a § 1983 municipal liability claim.  *Id.* at

23   391–92 ("In virtually every instance where a person has had his or her constitutional rights

24   violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could

25   have done' to prevent the unfortunate incident. . .  Thus, permitting cases against cities for their

26   'failure to train' employees to go forward under § 1983 on a lesser standard of fault would result

27   in de facto respondeat superior liability on municipalities—a result we rejected in *Monell*.").

28             As Defendants argue, Plaintiffs' assertion that deputies did not receive post-academy

1   training relies on the fact that a specific training program on this issue, Crisis Intervention Team

2   (CIT) training, was not implemented until after the incident.  (ECF No. 34 at 3.)  Plaintiff does

3   not point to any other evidence to support Deputy McEntire's lack of training, with the exception

4   of his Personnel Training History, which he testifies does not include all of his training.  (Dep. of

5   Deputy David McEntire, 25:16–27:4.)  However, the factual record indicates that, even before the

6   implementation of CIT training, County deputies received training on handling mentally ill

7   individuals and § 5150 calls in a variety of settings through formal and informal training

8   programs.  (Decl. of Santos Ramos in Supp. of Defendants' Mot. for Summ. J., ECF No. 24-4 at ¶

9   4.)  Deputy McEntire himself states in his deposition that he received on-the-job training on

10  handling mentally ill individuals in a variety of ways.  (Dep. of Deputy David McEntire, 102:2–

11  10.)  Plaintiffs do not offer any facts to dispute this assertion.

12      Moreover, even if Deputy McEntire, and other officers within Sacramento County, did not

13  receive further training on dealing with mentally ill individuals following their graduation from

14  their academy program, Plaintiff offers no reason why that amount of training constitutes

15  deliberate indifference to the needs of mentally ill individuals.  Plaintiffs simply apply a circular

16  logic, arguing that Deputy McEntire could not have been properly trained because, if he had been,

17  Johnathan would not have suffered such violations of his rights.  (ECF No. 27 at 5.)  Such logic,

18  without further facts or analysis as to why the training employed demonstrates deliberate

19  indifference to the rights of the mentally ill population, is insufficient to support Plaintiffs' claim.

20  Therefore, the Court finds it appropriate to award summary judgment in favor of Defendants on

21  this issue.

22                      *ii.    Failure to Supervise*

23      Plaintiffs also argue that the County's actions and omissions in supervising its deputies

24  constituted deliberate indifference to Johnathan's rights.  (ECF No. 27 at 6.)  Plaintiffs argue that,

25  while the County collects data on complaints brought against individual officers, it does not

26  analyze or employ that data in any meaningful way.  (ECF No. 27 at 6.)  Specifically, Plaintiffs

27  allege that Deputy McEntire "has been sued multiple times for excessive force and additionally

28  has had an alarmingly disproportionate number of excessive force complaints and other IA

9

1    complain[t]s brought against him," but that Defendants have failed to use that information to

2    discipline or address Deputy McEntire.  (ECF No. 27 at 6.)  However, even assuming that the

3    facts asserted by Plaintiffs as to Deputy McEntire are undisputed, the Court would still be

4    required to grant summary judgment in favor of Defendants.

5            The Ninth Circuit has held that "a constitutional violation may arise from training

6    or supervision where the training or supervision is sufficiently inadequate as to constitute

7    'deliberate indifference' to the rights of persons with whom the police come into contact."  *Davis*

8    *v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989).  However, to establish a deliberate

9    indifference, Plaintiffs are required to allege facts in support of the contention that the County of

10   Sacramento had a custom, practice, or de facto policy that inflicted the decedent's injury.  *Monell*,

11   436 U.S. at 694.  A single incident will not suffice to show a policy.  *See Christie v. Iopa*, 176

12   F.3d 1231, 1235 (9th Cir. 1999).  Plaintiffs must show a longstanding practice or custom which

13   constitutes the standard operating procedure of the local government entity.  *See Trevino v. Gates*,

14   99 F.3d 911, 918 (9th Cir. 1996).

15           Plaintiffs have failed to show such a custom or practice here.  Plaintiffs point only to the

16   County's alleged failure to address Deputy McEntire's "extraordinary number of complaints."

17   (ECF No. 27 at 7.)  Even if Plaintiffs could show that this failure was the moving force behind

18   Johnathan's injury, the failure of the County to address these complaints with Deputy McEntire, a

19   single employee, does not meet the standard set forth by the Supreme Court.[2]  *Blankenhorn v.*

20   *City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007).  Failure to supervise a single officer may

21   demonstrate negligence, at best, but cannot meet the Supreme Court's requirement that the

22   municipality exhibit "deliberate indifference."  *Id.*

23           Plaintiffs further argue that Defendants do not "analyze or utilize [data of complaints

24   against individual officers] in any way" and fails overall to "track the number of uses of force

---

[2] Plaintiffs cite to an Eighth Circuit case, *Harris v. City of Pagedale*, 821 F.2d 499 (8th Cir. 1987), for the proposition
that a municipality may be liable where it "becomes clear that a police force needs close and continuing supervision
because of a known pattern of misconduct, and the municipality fails to provide such supervision, the inevitable
result is a continuation of the misconduct."  *Id.* at 508 (internal citations omitted).  Even in *Harris*, however, the
court's analysis applies to a "known pattern" involving multiple officers, not yet one individual.  *Id.*  Thus, the case
bolsters the Ninth Circuit law on which this Court relies.

1    attributed to specific officers." (ECF No. 27 at 6 and Plaintiff's Separate Statement of Disputed

2    Fact, ECF No. 31 at ¶¶ 1–2.)  However, Plaintiffs fail to put forth any analysis or supporting

3    evidence as to why Defendants' failure to analyze data in this specific way could demonstrate a

4    pattern or practice of deliberate indifference.  "Liability for improper custom may not be

5    predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient

6    duration, frequency and consistency that the conduct has become a traditional method of carrying

7    out policy." *Trevino*, 99 F.3d at 918.  The Court finds that Plaintiffs have failed to provide

8    evidence permitting a reasonable jury to find in favor of Plaintiffs as to this claim and hereby

9    grants summary judgment in favor of Defendants.

10                             *iii.*     *Failure to Investigate*

11          Finally, Plaintiffs allege that Defendants demonstrated an unconstitutional custom,

12   practice or policy of failing to thoroughly investigate Johnathan's death and that this omission

13   demonstrated deliberate indifference.  (ECF No. 27 at 7–9.)  Plaintiffs further allege that the

14   County did not investigate a single officer involved shooting from 2007-2012 and that this failure

15   resulted in deliberate indifference to Johnathan's rights.  (ECF No. 27 at 8–9.)  These arguments

16   do not meet the threshold established in *Monell* and therefore cannot support Plaintiffs' claim.

17          Plaintiffs attempt to make two different arguments with respect to Defendants' alleged

18   failure to investigate.  First, Plaintiffs argue that Defendants failed to investigate the

19   circumstances surrounding Johnathan's death.  (ECF No. 27 at 7–8.)  Second, Plaintiffs maintain

20   that Defendants' failed to investigate any officer related shootings between 2007 and 2012.  (ECF

21   No. 27 at 8–9.)  Plaintiffs' first argument cannot stand because "the civil rights of a person cannot

22   be violated after death, and therefore the scope of an investigation after death is not actionable."

23   *Estate of Cartwright v. Concord*, 618 F.Supp. 722, 730 (N.D. Cal. 1985), *aff'd*, 856 F.2d 1437

24   (9th Cir. 1988).  The case law on this issue supports the logical conclusion that even the most

25   thorough investigation of Johnathan's case would not have prevented the alleged constitutional

26   violations brought about by the circumstances of his death.  Plaintiffs cannot claim that

27   Defendants' failure to investigate Johnathan's death was "the moving force behind violations

28   suffered by Johnathan." (ECF No. 27 at 9.)  Therefore, Plaintiffs argument must fail on these

                                            11

1   grounds.

2          Plaintiffs might have had stronger grounds with respect to their second argument, that a

3   *policy or practice* of not investigating officer involved shootings prior to the incident involving

4   Johnathan promotes further misconduct, thereby promoting the incident itself.  (ECF No. 27 at 8–

5   9.)  However, Plaintiffs also fail in this instance to provide sufficient evidence of a policy or

6   practice sufficient to sustain their claim.  Plaintiffs allege that "the department's Internal Affairs

7   unit did not investigate a single officer involve shooting in a six year period [from 2007-2012]."

8   (ECF No. 27 at 8–9.)  Plaintiffs then cite to the declaration of John J. Ryan, who states, "[i]t is

9   well known in law enforcement that the failure to properly investigate use of force and officer

10  involved shootings leads to an understanding by officers that their actions will not be reviewed

11  and therefore they will not be held accountable for improper uses of force."  (Decl. of J. Ryan,

12  ECF No. 28-1 at ¶ 96.)

13         Unfortunately, the causal link Plaintiffs rely on, that the Internal Affairs unit's failure to

14  investigate constitutes an overall failure to investigate, is simply not supported by the record.  The

15  deposition of Sergeant Mitch Andrews, portions of which Plaintiffs cite for their assertions,

16  indicates that each officer related shooting in 2009-2011 "was investigated by a homicide unit

17  and reviewed by Internal Affairs unit."  (Dep. of M. Andrews, ECF No. 28-3 at 16–17.)  In a

18  separate deposition, also cited by Plaintiffs, Sergeant Andrews further states that the Internal

19  Affairs unit does not conduct investigations on its own, rather it is responsible for understanding

20  and knowing what is occurring within an investigation.  (Dep. of M. Andrews as Person Most

21  Knowledgeable, ECF No. 2804 at 5–6.)  Moreover, the declaration of Captain Matthew Morgan,

22  attached in support of Defendants' motion for summary judgment, clearly states, "Internal Affairs

23  investigates officer involved shootings from an administrative point of view" and further

24  indicates that officer involved shootings that occur within Sacramento County are investigated by

25  the Sheriff's Homicide Bureau.  (Decl. of M. Morgan, ECF No. 24-4 at ¶¶ 10–11.)  While the

26  record appears to offer sufficient disputed material facts as to whether the Internal Affairs unit

27  investigated officer shootings in those years, Plaintiffs simply outright ignore that the record in

28  this case shows that investigations of officer shootings do not occur only within the Internal

1    Affairs unit.

2         Plaintiffs offer no explanation as to why the Homicide Bureau's investigation is

3    insufficient or why limiting the Internal Affair unit's role in investigations to an administrative

4    review would constitute a pattern or policy that is deliberately indifferent to Johnathan's

5    constitutional rights.  Far from offering facts in support of its analysis, Plaintiffs fail to simply

6    offer any analysis at all as to why this practice fails.  Therefore, Plaintiffs claim on this issue must

7    also fail.

8           C.    <u>Standing</u>

9         Defendants argue that Plaintiffs do not have standing to bring § 1983 federal or state

10   survival actions because they have not met the standing requirement under California law.  (ECF

11   No. 24-1 at 9.)  Specifically, Defendants argue that Plaintiffs have failed to execute and file an

12   affidavit or declaration stating compliance with California Code of Civil Procedure § 377.32.

13   (ECF No. 24-1 at 9.)  Plaintiffs respond that they clearly allege in both the caption and the body

14   of their complaint that Theodore Rose and Karen Rose are the successors in interest of Johnathan.

15   (ECF No. 27 at 9.)

16        California's statutory requirements for standing to bring a survival action are stated under

17   California Code of Civil Procedure § 377.30: "A cause of action that survives the death of the

18   person entitled to commence an action or proceeding passes to the decedent's successor in interest

19   . . ., and an action may be commenced by the decedent's personal representative or, if none, by the

20   decedent's successor in interest."  *See also Tatum v. City & Cnty. of San Francisco*, 441 F.3d

21   1090, 1093 n. 2 (9th Cir. 2006) ("Where there is no personal representative for the estate, the

22   decedent's 'successor in interest' may prosecute the survival action if the person purporting to act

23   as successor in interest satisfies the requirements of California law....") (citing Cal. Civ. Proc.

24   Code §§ 377.30, 377.32).  Plaintiffs have alleged that they are bringing many of their claims as

25   successors in interest, but there is a question as to whether the requisite affidavit to commence a

26   survival action as Johnathan's successor in interest has been filed.  *See* Cal. Civ. Proc. Code §

27   377.32; *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1229 (9th Cir. 2013).  At this late juncture in

28   this litigation, the Court is not going to delay deciding matters concerning the legal merits of

1  Plaintiffs' claims on this technicality.[3]  However, if such affidavits have not been filed, Plaintiffs

2  are hereby ordered to do so within thirty (30) days of the entry of this order.  Should Plaintiffs fail

3  to effectuate the required filings or should the information within such filings show that Plaintiffs

4  are not in fact successors in interest, this Court shall dismiss the survival causes of action in this

5  case.

6  **IV.   CONCLUSION**

7  For the foregoing reasons, the Court hereby GRANTS summary judgment in favor of

8  Defendants on Plaintiffs' third cause of action and DENIES Defendants' motion as to Plaintiffs'

9  second cause of action and Plaintiffs' standing.

10

11  Dated: February 16, 2016

12

13  _____

14  Troy L. Nunley
   United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28
_____
[3] Within Plaintiffs' complaint, they assert that they have standing because Theodore Rose is the father of decedent Johnathan Rose and Karen Rose is the mother of decedent Johnathan Rose.  (ECF No. 1 at ¶¶ 4–5.)

14