1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   ESTATE OF JOHNATHAN ROSE,                No.  2:13-cv-01339-TLN-EFB
     deceased by and through his parents,
12   THEODORE ROSE, JR. and KAREN
     ROSE, et al.,
13
                    Plaintiffs,               **ORDER GRANTING IN PART AND**
                                              **DENYING IN PART DEFENDANTS'**
14          v.                                **MOTION TO ALTER OR AMEND**
                                              **JUDGMENT**
15   COUNTY OF SACRAMENTO and
16   Sacramento County Sheriff's Department
     Deputy DAVID MCENTIRE,
17
                    Defendants.
18

19

20          This matter is before the Court on Defendants County of Sacramento and David

21   McEntire's (collectively "Defendants") Motion for Order Altering/Amending the Judgement to

22   Strike the Award of Noneconomic Damages to Plaintiff Theodore Rose, Jr. and/or for Judgement

23   as a Matter of Law and/or in the Alternative an Order for a New Trial.  (ECF No. 166.)  Plaintiffs

24   Estate of Johnathan Rose, Karen Rose, individually, and Karen Rose, Tiffany Rose, and Theodore

25   Rose III, as successors-in-interest to Theodore Rose, Jr., (collectively "Plaintiffs") oppose the

26   motion.  (ECF No. 178.)  The Court has carefully reviewed the arguments made by the parties

27   and for the reasons set forth below GRANTS IN PART and DENIES IN PART Defendants'

28   Motion.  (ECF No. 166.)

                                              1

## I.    BACKGROUND

The parties are aware of the facts in this case.  Thus, the Court will provide only a brief synopsis of the events forming the basis for this case and then move to a discussion of the relevant procedural history.

This case arises out of the fatal shooting of Johnathan Rose ("Johnathan") by Sacramento County Deputy Sheriff David McEntire ("Defendant McEntire"), on January 17, 2012.  Plaintiffs argued at trial that Defendant McEntire used excessive and unreasonable force when he struck Johnathan with a police flashlight and shot Johnathan three times.  Plaintiffs sought damages arising out of the death of their son.  Defendants asserted at trial that Defendant McEntire's use of force was reasonable under the circumstances, denied all liability, and disputed the nature and extent of damages.

A jury trial commenced on September 19, 2017.  (ECF No. 125.)  Plaintiffs argued two claims at trial: (1) a § 1983 claim for violation of Johnathan's Fourth Amendment Rights by use of excessive force; and (2) a California state law claim for wrongful death pursuant to California Code of Civil Procedure § 337.60 based on state law battery.  (ECF No. 1.)  Plaintiffs intended to call Johnathan's father, Plaintiff Theodore Rose, Jr., ("Rose, Jr.") to the stand during trial.  Unfortunately, Rose, Jr., passed away after the second day of trial and prior to his testimony.  (ECF No. 127.)  The Court resumed the trial with the understanding that Plaintiffs would gather all necessary paperwork to substitute in Rose, Jr.'s successors-in-interest.  (ECF No. 172 at 7–8.)  The Court also acknowledged that pain and suffering damages — as to Rose, Jr. — did not survive his death.  (ECF No. 172 at 7:16–18.)

In lieu of live testimony, Plaintiffs presented Rose, Jr.'s deposition testimony by video to the jury.  (ECF Nos. 132 & 135.)  Both sides had an opportunity to choose portions of the testimony that conformed to the Court's pretrial *in limine* rulings and to object to portions they believed were outside the scope of the Court's rulings.  (ECF No. 172 at 19:2–33:8.)  The remainder of the trial proceeded as would any other trial.

At the close of evidence, the jury found Defendant McEntire's use of a firearm on Johnathan constituted a battery and Defendant McEntire used excessive force in violation of the

Fourth Amendment. (ECF No. 146 at 1:6–12.) The jury awarded a total of $6.5 million to Plaintiffs, $2 million of which was awarded to Rose, Jr. for his "past loss of Johnathan Rose's love, companionship, comfort, care, assistance, protection, affection, society, and moral support." (ECF No. 146 at 1:26–28.) The Court withheld issuing judgment until the successors-in-interest were afforded an opportunity to gather the death certificate and file declarations.[1] After appropriate motions and documentation, the Court substituted Karen Rose, Tiffany Rose, and Theodore Rose III *nunc pro tunc* as successors-in-interest to Rose, Jr. (ECF No. 151.) Judgment was then issued. (ECF Nos. 152 & 153.) Defendants timely filed the instant motion to alter or amend judgment and for a new trial. (ECF No. 166.)

## II.   STANDARD OF LAW

### A. Rule 59(e)

Federal Rule of Civil Procedure ("Rule") 59 provides that a court may "grant a new trial on all or some of the issues and to any party after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Rule 59 does not specify the grounds on which a motion for a new trial may be granted." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). "Rather, the court is 'bound by those grounds that have been historically recognized.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003)). Recognized grounds include, but are not limited to, allegations "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

The Ninth Circuit has held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski*, 481 F.3d at 729 (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). "Upon the Rule 59 motion of the party against whom a verdict has been returned, the district court has 'the duty to weigh the

---

[1] Defendants did not oppose the substitution of the successors-in-interest insofar as they sought to recover economic damages Rose, Jr. suffered before death. Defendants acknowledge a substitution purely for that purpose is proper. (ECF No. 166-1 at 8.)

evidence as the court saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in the court's conscientious opinion, the verdict is contrary to the clear weight of the evidence.'" *Molski*, 481 F.3d at 729 (quoting *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)). "In considering a motion for a new trial, the court may weigh the evidence and assess the credibility of witnesses, and the court need not view the evidence in the light most favorable to the prevailing party." *Air–Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 190 (9th Cir. 1989).

### B. Rule 60(b)

Rule 60(b) allows a court to relieve a party from a final judgment, order, or proceeding, based on several listed reasons. Fed. R. Civ. P. 60(b). Rule 60(b) reads in relevant part:

> On motion and just terms, the Court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

### III. ANALYSIS

As an initial matter, without any analysis or discussion, Defendants move for a motion for judgment as a matter of law under Rule 50(b). (ECF No. 166-1 at 9:16–18.)[2] "Rule 50 requires a party seeking judgment as a matter of law to file a Rule 50(a) motion at any time before the case

---

[2] For ease of reference, the Court cites to the page numbers assigned by the Electronic Court Filing ("ECF") system and not to the page numbers assigned by the parties.

is submitted to the jury. If the jury later returns a verdict against the moving party, this party may then file a Rule 50(b) motion for judgment as a matter of law." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1081 (9th Cir. 2009). As Defendants did not move for a directed verdict under Rule 50(a), they are procedurally barred from bringing a motion for judgment as a matter of law under Rule 50(b). Accordingly, the Court hereby denies Defendants' motion insofar as Defendants move for judgment as a matter of law pursuant to Rule 50(b).

Having dispensed with Defendant's motion for Judgement as a Matter of Law, the Court will now turn to a discussion of the two remaining issues: whether to alter/amend judgement to strike the award of $2 million in damages to Rose, Jr.'s successors-in-interest, and whether to grant the request for a new trial. (*See generally* ECF No. 166-1.)

A. <u>Award of Damages to Plaintiff Theodore Rose, Jr.'s Successors-in-Interest</u>

Defendants contend the successors-in-interest to Rose, Jr. are not entitled to collect damages for Rose, Jr.'s loss of love, society, consortium, and company of his son up to and until his death. Defendants assert those types of damages are precluded under California's survivor statute, California Code of Civil Procedure § 377.34. Plaintiffs argue the successors-in-interest may still recover those damages as they are not specifically precluded under § 377.34. Thus, the parties dispute whether Rose, Jr.'s successors-in-interest — substituted in under the survival statute — are entitled to the aforementioned damages under § 377.34. For clarity's sake, the Court will first discuss the statutory schemes for wrongful death and survival statutes, and then turn to a discussion of the positions of the parties before determining the effect of § 377.34 on recovery of the successors-in-interest damages for loss of Johnathan's love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

i. *Statutory Scheme*

California Code of Civil Procedure § 377.60 creates a "cause of action for the death of a person caused by the wrongful act or neglect of another," that may be raised by a decedent's personal representative. Cal. Civ. Proc. Code § 377.60(a). A person suing under § 377.60 is entitled to damages "that, under all circumstances of the case, may be just, but may not include damages recoverable under Section 377.34." Cal. Civ. Proc. Code § 377.61. The damages may

include "(1) direct pecuniary loss, such as loss of financial support from the decedent; (2) loss of services, advice or training; (3) funeral expenses; and (4) . . . noneconomic loss consisting of the loss of the decedent's love, companionship, comfort, affection, society, solace or moral support." *Boeken v. Philip Morris USA, Inc.*, 159 Cal. App. 4th 1391, 1400 (2008), *aff'd*, 48 Cal. 4th 788 (2010). Under the wrongful death statute, a plaintiff seeks damages meant to compensate for personal injury the heir suffered as a result of the death. *Quiroz*, 140 Cal. App. 4th at 1264.

Unlike a cause of action for wrongful death, a survival cause of action "is not a new cause of action that vests in the heirs on the death of the decedent"; rather, it is instead "a separate and distinct cause of action which belonged to the decedent before death but, by statute, survives that event. *Id.* Thus, California's survival statute assures that a cause of action passes to the decedent's successors-in-interest and is enforceable by the successors-in-interest or the personal representative of the decedent. Cal. Civ. Proc. Code § 377.30. Successors-in-interest are permitted to recover damages "limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement." Cal. Civ. Proc. Code § 377.34. California courts interpret the exclusionary provision of § 377.34 to include damages for emotional distress despite not expressly stating so in the statute. *See County of Los Angeles v. Superior Court*, 21 Cal. 4th 292, 305 (1999) (describing emotional distress as nonpecuniary loss not recoverable under § 377.34).

### ii.    *Defendants' Position*

Defendants seek to strike the award of damages to Rose, Jr.'s successors-in-interest. (ECF No. 166-1 at 10.) Defendants do not contest that the successors-in-interest were entitled to be substituted in for Rose, Jr. (ECF No. 166-1 at 10.) Instead, Defendants contend the right of the successors-in-interest to recover for Rose, Jr.'s pre-death losses was limited by § 377.34. (ECF No. 166-1 at 10.) Defendants assert no statute permits the successors-in-interest to recover noneconomic losses Rose, Jr. suffered before his death. (ECF No. 166-1 at 10.)

Defendants analogize *Williamson v. Plant Insulation Co.*, 23 Cal. App. 4th 1406, 1411 (1994), to their case. (ECF No. 166-1 at 11.) In *Williamson*, the California Court of Appeals was

6

tasked with determining what damages to award to a successor-in-interest when the plaintiff died during trail, but before judgment.  In *Williamson*, the court reviewed Probate Code § 573(c), the predecessor statute to § 377.34.  *See Sullivan v. Delta Air Lines, Inc.*, 15 Cal. 4th 288, 301 (1997) (explaining that § 377.34 restates former Probate Code § 573(c) *without substantive changes*).[3] The *Williamson* court explained that for Probate Code § 573(c) to have any effect, a line must be drawn and the "Legislature drew a clear line: noneconomic damages do not survive if a plaintiff dies before judgment."  *Williamson*, 23 Cal. App. 4th at 1417.

Additionally, Defendants cite *County of Los Angeles v. Superior Court*, 21 Cal. 4th 292, 305 (1999), in support of their position.  Defendants contend the court in *County of Los Angeles* held damages that do not add value to the decedent's estate are not recoverable in a survival action.  (ECF No. 166-1 at 12.)  In *County of Los Angeles*, the California Supreme Court analyzed the line drawn by the legislature between damages recoverable and those not recoverable under § 377.34.  *County of Los Angeles*, 21 Cal. 4th at 304–05.  The court held the Legislature intended to a draw a line between "pecuniary out-of-pocket losses" the plaintiff experienced as a result of the defendant's unlawful behavior and nonpecuniary "psychic injury" that is personal to the plaintiff.  *Id.*  The court reasoned the psychic injury does not reduce the value of the estate whereas the pecuniary out-of-pocket losses actually reduce the plaintiff's income or increase the pecuniary expenses.  *Id.*  In the instant case, Defendants argue the loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support which Rose, Jr. experienced before his death would not reduce the value of his estate.  (ECF No. 166-1 at 12.)  Thus, Defendants reason love, companionship, comfort, care, assistance, protection, affection, society, and moral support are personal to Rose, Jr. and are not recoverable under the logic in *County of Los Angeles*.  (ECF No. 166-1 at 13.)

### iii.    Plaintiffs' Position

Plaintiffs contend the award of damages to Rose, Jr.'s successors-in-interest for loss of Johnathan's love, companionship, comfort, care, assistance, protection, affection, society, and

---

[3]    Section 573(c) is the predecessor statute to § 377.34.  The California Supreme Court recognized in *Sullivan*, 15 Cal. 4th at 301, that "Section 573 was reenacted virtually verbatim in Code of Civil Procedure section 377.20," and "subdivision (c) of former section 573 – became Code of Civil procedure section 377.34."

7

moral support was proper.  (ECF No. 178 at 11.)  According to Plaintiffs, § 377.34 precludes the survival of pain, suffering, and emotional distress damages, but not the damages Rose, Jr. sought.  (ECF No. 178 at 11.)  Plaintiffs assert they did not seek pain, suffering, or emotional distress damages for Rose, Jr.  (ECF No. 178 at 12.)  Simply put, Plaintiffs argue Defendants incorrectly categorize the damages Rose, Jr. recovered (i.e., past loss of Johnathan's love, companionship, comfort, care, assistance, protection, affection, society, and moral support) as pain, suffering, and emotional distress damages.  (ECF No. 178 at 11.)

Plaintiffs argue the language and intent of the statute demonstrate damages for loss of Johnathan's love, companionship, comfort, care, assistance, protection, affection, society, and moral support are recoverable.  Plaintiffs contend § 377.34 specifically lists only pain, suffering, and disfigurement as excluded from survivor damages.  (ECF No. 178 at 13.)  Plaintiffs argue various state courts exclude emotional distress damages under § 377.34 while finding emotional distress damages overlap with pain and suffering.  (ECF No. 178 at 13.)  Plaintiff's position is the damages awarded to Rose, Jr. are separate and distinct from pain and suffering damages and thus still recoverable under § 377.34.  (ECF No. 178 at 13.)

Plaintiffs respond to Defendants argument regarding noneconomic damages not being recoverable under § 377.34 by focusing on the fact that the terms "noneconomic" or "economic" are not used in the text of § 377.34.  (ECF No. 178 at 13.)  Plaintiffs argue that the Legislature had the opportunity to prohibit the survival of all claims for noneconomic damages, but the plain language of the statue shows the Legislature chose not to create such a sweeping exclusion.  (ECF No. 178 at 14.)  Furthermore, Plaintiffs read § 377.20 to allow successors-in-interest the ability to recover all loss or damages sustained before death under any cause of action except as provided in § 377.34.  (ECF No. 178 at 14.)  Plaintiffs contend the cases cited by Defendants stating otherwise are merely applications of the plain language of § 377.34 in the context of pain, suffering, or disfigurement.  (ECF No. 178 at 14.)

Finally, Plaintiffs argue *County of Los Angeles* supports the position that wrongful death damages are still recoverable.  (ECF No. 178 at 15.)  In so arguing, Plaintiffs emphasize the California Supreme Court's distinction between "psychic injury" and "pecuniary losses," the

former not being recoverable while the latter is recoverable. (ECF No. 178 at 15.) Plaintiffs focus on the term pecuniary and assert based on prior case law, wrongful death damages are pecuniary in nature and not psychic. (ECF No. 178 at 15.) Plaintiffs argue society, comfort and protection are classified as pecuniary benefit. (ECF No. 178 at 15 (citing *Corder v. Corder*, 41 Cal. 4th 644, 672 (2007); *Quiroz v. Seventh Ave. Center*, 140 Cal. App. 4th 1256, 1264 (2006)).) Applying this definition of pecuniary to *County of Los Angeles*, Plaintiffs reason Rose, Jr.'s successors-in-interest can recover his damages for loss of Johnathan's love, companionship, comfort, care, assistance, protection, affection, society, and moral support because they are pecuniary not psychic. (ECF No. 178 at 15.)

*iv.*     *Discussion*

Rose, Jr. brought an action for wrongful death under California Code of Civil Procedure § 377.60. He sought damages under § 377.61 for the "loss of Johnathan Rose's love, companionship, comfort, care, assistance, protection, affection, society and moral support." (ECF No. 144 at 26.) Upon his death, Rose, Jr.'s successors-in-interest continued the lawsuit under California's survival action, Cal. Civ. Proc. Code § 377.20. The question thus is whether § 377.34's exclusion of damages for "pain, suffering, or disfigurement" limits the successors-in-interests right to recover damages for love, companionship, comfort, care, assistance, protection, affection, society, and moral support, damages Rose, Jr. would have recovered had he not died before judgement was rendered. For the reasons discussed below, the Court finds that § 377.34 does limit the successors-in-interest recovery of such damages.

In *County of Los Angeles*, the court considered whether California's survival statute could be applied to limit damages in federal court cases arising under 42 U.S.C. § 1983. *County of Los Angeles*, 21 Cal. 4th at 303–08. The California Supreme Court looked at what damages were permissible under § 377.34. *Id.* at 304–05. The court reasoned that the language of § 377.34 demonstrated the "Legislature's informed decision that pain, suffering, and disfigurement are injuries limited strictly to the person of the deceased and are not transmissible to the estate. Except for this limitation, California law allows the estate to recover all damages to which the deceased plaintiff would have been entitled." *Id.* at 305. The court concluded the Legislature

9

intended to draw a line between "pecuniary out-of-pocket losses" and nonpecuniary "psychic injury." *Id.* Essentially, a party may recover out-of-pocket losses, such as "lost or reduced wages or expenses of medical care" because the value of the deceased's estate would be reduced if left uncompensated. *Id.* In contrast, injuries specific to the deceased such as pain and suffering and emotional distress do "not in [themselves] reduce income or increase expenses." *Id.*

As discussed above, Plaintiffs assert the damages awarded to Rose, Jr. for love, companionship, comfort, care, assistance, protection, affection, society, and moral support are pecuniary in nature, and thus, fall within the first category enumerated by the court in *County of Los Angeles.* (ECF No. 178 at 15.) In support, Plaintiffs cite to *Corder*, which in Plaintiffs' view defines society, comfort, and protection of the deceased as pecuniary. In the first instance, the Court notes that the *Corder* case is distinguishable from the instant case in that it dealt solely with the wrongful death statute, § 377.61. Nowhere in *Corder* does the court discuss the survivor statute, § 377.34, nor does *Corder* discuss the fact that § 377.34 specifically excludes certain damages otherwise recoverable under § 377.60. Thus, while *Corder* does define the term pecuniary in the context of society, comfort and protection, it does not define pecuniary in the context of survivor damages nor does it discuss § 337.34 as the court does in *County of Los Angeles.* Even were this Court to view *Corder* to define the term "pecuniary," the Court is unable to say that the definition supports Plaintiffs' argument.

In the context of the wrongful death statute, the *Corder* court described society, comfort, and protection as having "pecuniary benefit" and "pecuniary value" that can be lost. *Corder*, 41 Cal. 4th at 661. However, in describing the distinction between pecuniary and non-pecuniary damages, the court in *County of Los Angeles* focused on the whole term "pecuniary out-of-pocket expenses" and gave the example of the loss or reduction in wages for pecuniary damages. Clearly, comfort, society and protection do not amount to an out-of-pocket loss, rather they are personal to Rose, Jr. In fact, the *Corder* court explained wrongful death damages "are measured by the financial benefits the heirs were receiving at the time of death, those reasonably to be expected in the future and the monetary equivalent of loss of comfort, society and protection." *Corder*, 41 Cal. 4th at 661 (quoting *Benwell v. Dean*, 249 Cal. App. 2d 345, 349 (1967)). The

*Corder* court acknowledged that any damages for loss of comfort, society, and protection are merely *monetary equivalents*, a stark contrast to the *County of Los Angeles* description of out-of-pocket losses that "actually reduced the plaintiff's income or increased the plaintiff's pecuniary expenses." *Compare Corder*, 41 Cal. 4th at 661 *with County of Los Angeles*, 21 Cal. 4th at 305.

Loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support are examples of those nonpecuniary, psychic injuries the California Supreme Court discussed in *County of Los Angeles*. Such damages are personal to Rose, Jr. and do not reduce the estate in any way. While courts and juries continuously calculate a monetary equivalent value for those losses in wrongful death cases, such calculations do not transform the damages into out-of-pocket expenses which survive a plaintiff's death. The Court is cognizant of the tragedy of these events and the pain the remaining Plaintiffs have suffered with the loss of Johnathan Rose and Rose, Jr. However, "a line must be drawn if section 573(c) is to have any effect at all, and in that section, the Legislature drew a clear line: noneconomic damages do not survive if the plaintiff dies before judgment." *Williamson*, 23 Cal. App. 4th at 1417. Accordingly, Rose, Jr.'s successors-in-interest cannot recover for the loss of Johnathan's love, companionship, comfort, care, assistance, protection, affection, society and moral support Rose, Jr. suffered before his death.

As the Ninth Circuit has explicitly stated ". . . . [s]ection 377.34 limits damages in survival actions to the victim's pre-death economic losses." *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1104 (9th Cir. 2014) (citing *People v. Runyan*, 54 Cal. 4th 849 (2012)). The Court grants Defendants' motion and strikes the award of $2 million to Rose, Jr., by and through his successors-in-interest.

B.  Motion for New Trial

Pursuant to Rule 59(e), Defendants move for a new trial on the grounds that the verdict was against the great weight of the evidence. (ECF No. 166-1 at 13.) First, Defendants contend Rose, Jr.'s testimony presents undisputed evidence that the use of deadly force was justified: (1) the testimony does not explain why Defendant McEntire would voluntarily lie on the bed; (2) the testimony regarding the position of the body after the shooting is contrary to the physical

11

evidence rule; (3) the testimony shows Rose, Jr. only spoke to Johnathan after the fighting began; and (4) the testimony demonstrates Johnathan threw punches at Defendant McEntire. (ECF No. 166-1 at 14–16.) Second, Defendants assert the testimony of Rose, Jr., should be discredited because of inconsistencies between his statement to Detective Tracey and his deposition testimony. (ECF No. 166-1 at 16–18.)

Plaintiffs argue the weight of the evidence supports the jury's verdict. (ECF No. 178 at 17.) Plaintiffs assert the undisputed evidence does not lend itself to the conclusion Defendant McEntire used reasonable force. (ECF No. 178 at 18–19.) Plaintiffs insist the inconsistencies in Rose, Jr.'s two statements are trivial and Defendants had an opportunity to ask about the first statement in the deposition. (ECF No. 178 at 19–20.) Finally, Plaintiffs contend the objective physical, forensic and medical evidence coupled with the eyewitness testimony and expert testimony was sufficient for the jury to find the use of deadly force unreasonable. (ECF No. 178 at 20–24.)

"The trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski*, 481 F.3d at 729; (quoting *Passantino.*, 212 F.3d at 510 n.15). "Upon the Rule 59 motion of the party against whom a verdict has been returned, the district court has 'the duty to weigh the evidence as the court saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in the court's conscientious opinion, the verdict is contrary to the clear weight of the evidence.'" *Molski*, 481 F.3d at 729 (quoting *Murphy*, 914 F.2d at 187). "In considering a motion for a new trial, the court may weigh the evidence and assess the credibility of witnesses, and the court need not view the evidence in the light most favorable to the prevailing party." *Air–Sea Forwarders, Inc.*, 880 F.2d at 190.

The Court will first review the "undisputed evidence" Defendants purport to present. Next, the Court will turn to a discussion of the inconsistencies in Rose, Jr.'s statements and the effects of those inconsistencies.

///

///

Defendants allege the following as undisputed evidence that justify a new trial: 1) Rose, Jr.'s testimony does not explain why Defendant McEntire would voluntarily lie on the bed; 2) the testimony regarding the position of the body after the shooting is contrary to the physical evidence rule; 3) the testimony shows Rose, Jr. only spoke to Johnathan after the fighting began; and 4) the testimony demonstrates Johnathan threw punches at Defendant McEntire.  (ECF No. 166-1 at 14–16.)  The Court will address each in turn.

First, Defendants assert Plaintiffs offer no explanation as to why Defendant McEntire would voluntarily lie on a bed and remain there while being struck by Johnathan.  (ECF No. 166-1 at 14.)  Plaintiffs counter that Plaintiffs never argued Defendant McEntire voluntarily laid down on the bed.  (ECF No. 178 at 18.)  As an initial matter, a review of the entire trial transcript, the depositions, and the evidence at trial clearly shows there was no evidence that Defendant McEntire voluntarily laid down on the bed.  Rose, Jr. testified at his deposition that Johnathan looked glazed and that he looked like he would lose consciousness after Defendant McEntire struck him in the head with the flashlight and as a result fell on the bed.  (ECF No. 166-6 at 139:5–8.)  According to Rose, Jr., Defendant McEntire then jumped on Johnathan, straddling him on the bed, and started punching Johnathan continuously in the head.  (ECF No. 166-6 at 141:1–8.)  Johnathan began to "resist [the officer] and push against and fight against the officer back."  (ECF No. 166-6 at 143:6–13.)  Rose, Jr. testified that Johnathan then rolled Defendant McEntire off him, "McEntire, was on his left-hand side, and they were like this together side by side, still laying on the bed going at it."  (ECF No. 166-6 at 144:5–7.)  Thus, this portion of Rose, Jr's. testimony doesn't suggest Defendant McEntire voluntarily laid down on the bed.  Rather, this evidence, if believed by the jury, demonstrates Johnathan fell onto the bed and Defendant McEntire jumped on him as an active participant.

Further, Defendant McEntire testified that he hit Johnathan with the flashlight, Johnathan stumbled backwards, and fell against the wall.  (ECF No. 176 at 724:22–725:1.)  After Johnathan tried to get to a knee, Defendant McEntire closed the distance, whereupon Johnathan attempted to strike Defendant McEntire.  (ECF No. 176 at 725:16–18; 726:19–20.)  Defendant tried to defend

himself by using his flashlight a second time, and Johnathan grabbed Defendant McEntire's knees and took him onto the bed. (ECF No. 176 at 726:24–727:5.) Defendant McEntire landed on his back on the bed, tried to push Johnathan off of him, and unsuccessfully threw a punch at Johnathan. (ECF No. 176 at 728:6–8; 730:11–22.) Johnathan continued to throw punches at Defendant McEntire who put his hands up to prevent punches to his face. (ECF No. 176 at 731:6–11.) Simply put, there was never any "undisputed evidence" that Defendant McEntire voluntarily laid down on the bed. As the foregoing illustrates, the jury heard evidence as to how both Defendant McEntire and Johnathan came to be on the bed. Based on the evidence and the jury's verdict, the jury ultimately found Defendant McEntire was the aggressor.

Next, Defendants argue the movement and positioning of Johnathan's body compels the conclusion that Johnathan was on top of Defendant McEntire at the time of the shooting. (ECF No. 166-1 at 15.) Defendants assert the "physical facts" rule — which requires a court to discount testimony that is contrary to the physical facts — compels the Court to discredit Rose, Jr.'s testimony. *Zollman v. Symington Wayne Corp.*, 438 F.2d 28, 31–32 (7th Cir. 1971). Plaintiffs assert the physical evidence rule supports Rose, Jr.'s account of the positioning of Defendant McEntire and Johnathan during the fight because the testimony comports with the physical evidence and expert testimony. (ECF No. 178 at 19.) Rose, Jr. testified at his deposition that at the time Johnathan was shot, Rose, Jr. was on the bed behind Johnathan attempting to pull him away from Defendant McEntire. (ECF No. 166-6 at 149:18–150:14.) Johnathan and Defendant McEntire were laying on the bed side-by-side going at it. (ECF No. 166-6 at 144:5–7.) Defendant McEntire was on his left side and Johnathan was on his right side, striking each other with fists. (ECF No. 166-6 at 144:1–7; 145:20–146:10.) Rose, Jr.'s arms were completely around Johnathan as he was pulling Johnathan away from Defendant McEntire. (ECF No. 166-6 at 147:16–148:3.) As Rose, Jr. was telling Johnathan to stop, Defendant McEntire shot Johnathan three times. (ECF No. 166-6 at 149:23–150:3) Following the shots, Rose, Jr. let go of his son and stood up and then Defendant McEntire pushed Johnathan away from him and stood up from the bed as well. (ECF No. 166-6 at 151:16–23.) Once both Rose, Jr. and Defendant McEntire stood, Johnathan was lying face down on the bed with his knees on the floor. (ECF No. 166-6 at

14

152:3–4.)  Defendants suggest Johnathan's body would not have ended up in that position had Defendant McEntire pushed him away as Rose, Jr. testified.  (ECF No. 166-1 at 15.)  Instead, Defendants argue Johnathan must have been on top of Defendant McEntire for his body to end up in that position.

Plaintiff's expert Dr. Bennet Omalu testified the incident could not have occurred in the manner in which Defendant McEntire testified.  Specifically, Dr. Omalu stated Defendant McEntire "was essentially on top of an immobilized and overwhelmed Johnathan and was able to hold him down."  (ECF No. 174 at 389:19–20.)  Dr. Omalu further testified "[t]he officer's proposition on what happened contradicts the science and what is possible with the human body."  (ECF No. 173 at 352:8–10.)  Additionally, Plaintiff's expert, Lance Martini, opined on the position of Johnathan's body on the bed at the end of the incident.  Specifically, when asked by defense counsel whether the body could have ended up face down on the bed in Rose, Jr's version of the incident, Mr. Martini opined it was a possibility the body would fall towards the father, but "not necessarily an absolute."  (ECF No. 172 at 260:20–25.)  Mr. Martini went on to say "[g]iven the body positionings, [he] could see [the final body position] occurring either when [Johnathan and Defendant McEntire] are on their sides or with the decedent on top of the deputy."  (ECF No. 172 at 262:20–22.)  Given Dr. Omalu's testimony that Defendant McEntire's version of the incident is not scientifically plausible and Mr. Martini's testimony regarding the final position of the body, the Court cannot say the position of the body is contrary to the physical evidence rule such that Rose, Jr.'s account should be disregarded.   Moreover, A reasonable jury could have concluded from the testimony that as both Rose, Jr. and Defendant McEntire pushed Johnathan away and stood up from the bed, the body was left to fall on his stomach, making Rose, Jr.'s testimony plausible.

Next, Defendants contend Rose, Jr., only spoke to Johnathan after the altercation began, pleading with Johnathan to stop resisting.  (ECF No. 166-1 at 14–15.)  The Court is confused as to why Defendants discuss Rose, Jr. only speaking with Johnathan after the altercation began.  Defendants offer no explanation as to the significance of such a finding.  The only reasonable explanation the Court can find is that offered by Plaintiffs.  Plaintiffs contend this argument

suggests the jury should have inferred from Rose, Jr.'s attempts to talk to Johnathan that Johnathan was the aggressor.  (ECF No. 178 at 18.)  However, another inference the jury could have reached was Defendant McEntire initiated an unlawful assault upon Johnathan and Rose, Jr's. statement was a father's attempt to stop his son from striking back at Defendant McEntire because he felt the officer could hurt Johnathan.  In fact, Rose Jr.'s deposition testimony was "stop Johnny, he's going to hurt you."  There is nothing to suggest Rose, Jr's statement was only open to one inference or only open to the singular inference argued by Defendants.

Finally, Defendants assert it is undisputed that Rose, Jr. acknowledged Johnathan threw multiple punches at Defendant McEntire.  (ECF No. 166-1 at 15–16.)  Plaintiffs do not dispute this fact, but argue that the punches were in self-defense.  (ECF No. 178 at 19.)  The fact that Johnathan threw punches was not in dispute at trial.  However, Rose, Jr. provided testimony demonstrating Johnathan only punched the officer after Defendant McEntire attacked and continued to beat Johnathan.  As discussed above, Rose, Jr. testified that after Defendant McEntire struck Johnathan in the head with the flashlight, Johnathan looked glazed and like he would lose consciousness.  (ECF No. 166-6 at 139:5–8.)  According to Rose, Jr., up to the time he was hit with the flashlight, Johnathan was not resisting and had not struck Defendant McEntire.  Johnathan fell on the bed after the blow from the flashlight and Defendant McEntire then jumped on Johnathan, straddling him on the bed, and punching Johnathan continuously in the head.  (ECF No. 166-6 at 141:1–8.)  At that point, Johnathan began to "resist [the officer] and push against and fight against the officer back."  (ECF No. 166-6 at 143:6–13.)  Thus, the jury heard detailed testimony from Rose, Jr. that Johnathan did not strike or attempt to strike Defendant McEntire until after being pushed against the wall, hit in the head with a flashlight, and being straddled and punched continuously in the head.  Furthermore, as detailed below, the jury's verdict indicates their finding that the physical evidence supported the inference that Johnathan defended himself from an attack by Defendant McEntire.  *See infra* Section III.B.ii.b.

Defendants contention that Rose, Jr.'s testimony presents undisputed evidence that the use of deadly force was justified is without merit.  In weighing the evidence that was presented by both Defendants and Plaintiffs, this Court cannot say the jury's verdict is against the clear weight

of the evidence.  In the Court's opinion, the weight of the evidence clearly supported Plaintiff's position.  Simply put, the testimonial evidence, including the expert testimony, and the physical evidence weighed heavily in favor of Plaintiffs.  Further, the Court found the Plaintiffs' witnesses to be quite credible.  In contrast, the Court did not find Defendant McEntire to be very credible.  For example, he testified that Johnathan was on top of him hitting him eight to ten times in the face such that he thought he would either die or lose consciousness.  (ECF No. 171 at 77:3–6, 110:16–19.)  However, despite the fact that Johnathan was 6 feet tall and weighed 261 lbs. (ECF No. 175 at 585:21–25), the Court reviewed the pictures taken in the aftermath of the incident which showed very slight injuries to Defendant McEntire's face.  (ECF No. 142 at 2, Exhs. 16–18, 22.)  Defendants own expert witness, Dr. Fiore, the medical examiner, testified to a lack of corresponding injuries to Johnathan's hands that one would think to find on a person who repeatedly punched another.  (ECF No. 175 at 610:3–14.)  Additionally, Dr. Omalu testified that the pictures of Defendant McEntire's face showed a lack of blunt force trauma, and that in his opinion Defendant McEntire was not forcefully punched.  (ECF No. 174 at 339:17–19.)  In contrast, after reviewing the reports, autopsy reports, and autopsy photographs, Dr. Omalu opined that Johnathan received multiple blunt force trauma to his head, face, mouth, neck, trunk, and his extremities.  (ECF No. 174 at 339:25–340:3.)  As such, Defendants motion for a new trial on the grounds that the jury's verdict as to those issues was against the great weight of the evidence is denied.

### ii.    Inconsistencies in Theodore Rose, Jr.'s Statements

Defendants contend Rose, Jr.'s "description of the night's events changed in material respects between his recorded interview and his deposition." (ECF No. 166-1 at 16.)  Defendants assert the inconsistencies render the entire deposition testimony not credible or trustworthy. (ECF No. 166-1 at 16.)  Plaintiffs counter that the inconsistencies are trivial, and that Defendants confronted Rose, Jr. about the inconsistencies at his deposition.  (ECF No. 178 at 19.)  Plaintiffs further argue the objective physical, forensic, and medical evidence, as well as the expert testimony, demonstrate Defendant McEntire's "account of the incident was incredible."  (ECF No. 178 at 20.)  In response, Defendants assert Plaintiffs "cherry-picked the record" and

17

presented only the evidence supporting the verdict.  (ECF No. 181 at 7.)  Defendants argue

Plaintiffs offered no explanation for the deliberate change in Rose, Jr.'s testimony, and without

explanation, Defendant McEntire's account is the only credible account of the events.  (ECF No.

181 at 7.)

a.  A description of the inconsistencies

The inconsistencies pointed out by Defendants occurred prior to the actual physical

altercation between Defendant McEntire and Johnathan, approximately between the time Rose,

Jr. made the 9-1-1 call and Defendant McEntire entered the Rose home.  First, Defendants note

the difference between Rose, Jr.'s description of how he spent his time waiting for police to

arrive.  (ECF No. 166-1 at 16–17.)  In his statement to Detective Tracey immediately following

the shooting, Rose, Jr. stated he stayed in the room following the 9-1-1 call.  (ECF No. 166-7 at

34:10–17.)  He then stated that "when [he] went back out — when [he] went out to open the door

for the officer, I was surprised that [Johnathan] was [asleep]."  (ECF No. 166-7 at 36:21–23.)

Additionally, Theodore Rose, III testified at trial that as far as he remembered his father had

remained in the bedroom until the officer arrived.  (ECF No. 172 at 205:25–206:2.)  In contrast,

Rose, Jr. testified at his deposition that he went into the hallway about 10 minutes after the 9-1-1

call just to check on Johnathan and saw him playing video games.  (ECF No. 166-8 at 91:18–23.)

Rose, Jr. also testified at his deposition that he exited the bedroom again after another 15 minutes

passed to check on Johnathan.  (ECF No. 166-8 at 91:24–92:1.)

The jury could have very easily understood the deposition testimony to give more detail

than the statement to Detective Tracey.  In fact, Detective Tracey asked the family if Rose, Jr.

stayed in the bedroom the whole time he waited for police to arrive.  (ECF No. 166-7 at 36:1–8.)

Both Mrs. Karen Rose and Rose, Jr. answered the question in a mixed fashion.  Karen Rose

explained Rose, Jr. had returned from getting food prior to the incident with Johnathan and was

eating the food in the bedroom.  (ECF No. 166-7 at 36:9–11.)  Rose, Jr. qualified that he was too

upset to eat and had looked out the window watching for the police to arrive.  (ECF No. 166-7 at

36:12–15.)  Rose, Jr. never explicitly stated he stayed in the bedroom the entire time and the jury

could have inferred from the answer either that he stayed in the bedroom the entire time or that

18

his answer was incomplete.  Even the statement of Theodore Rose III does not prevent the jury finding that Rose, Jr. clarified his statement in his deposition.  (ECF No. 172 at 206:2.)  Theodore Rose III qualified his statement with "as far as I can remember," demonstrating that the testimony was based on Theodore Rose III's best recollection, not absolute certainty.

Second, Defendants argue Rose, Jr.'s testimony regarding looking out the window when Defendant McEntire arrived was inconsistent with his deposition testimony.  (ECF No. 166-1 at 17.)  In his statement to Detective Tracey, Rose, Jr. stated he knew the officer had arrived "because [he] was looking out the window."  (ECF No. 166-7 at 37:5–8.)  He continued that he saw the officer coming to the door and then went to the front door.  (ECF No. 166-7 at 37:13–18.)  In contrast, Rose, Jr. stated in his deposition that he looked for the deputy out the window of the bedroom.  (ECF No. 166-8 at 93:5–8.)  However, he stated he sat on the bed watching tv and "saw out the window some kind of commotion or light . . . [They] have drapes, and the drapes were drawn, and [he] saw some kind of light outside. So [he] went to the window and saw that the police had arrived."  (ECF No. 166-8 at 97:22–98:1.)  Defendants submitted pictures admitted at trial — Defendants' Exhibit B27 and B28 — of the bedroom with the drapes drawn and the blinds closed. (ECF Nos. 166-9 & 166-10; ECF No. 143 at 3.)  According to Defendants, the pictures demonstrate Rose, Jr. would not have been able to see anything if he was in fact sitting on the bed when Defendant McEntire arrived.  (ECF No. 166-1 at 17.)  Again, Rose, Jr.'s testimony is not completely inconsistent.  He stated he looked out the window and saw the deputy arrive in both statements.

Finally, Defendants assert the way Defendant McEntire entered the home was different in each statement.  (ECF No. 166-1 at 17.)  In his statement to Detective Tracey, Rose, Jr. stated "[He] saw him coming to the door now . . . . So [he] went to the front door and just opened the door and said, come on in sir."  (ECF No. 166-7 at 37:13–18.)  However, in his deposition testimony, Rose, Jr. stated he arrived at the door seconds before Defendant McEntire knocked but did not open it until the knock. (ECF No. 166-8 at 103:15–23.)  After Rose, Jr. opened the door, he claims he had no intention of letting Defendant McEntire in the house because the situation had resolved with Johnathan sleeping.  (ECF No. 166-8 at 104:1–19.)  According to Rose, Jr.'s

deposition testimony, he wanted to tell the officer that everything was fine, but before he could Defendant McEntire stepped into the doorway, walked in uninvited, and demanded to know were Johnathan was.  (ECF No. 166-8 at 105:17–25.)  Rose, Jr. explicitly denied inviting Defendant McEntire into the home.  (ECF No. 166-8 at 107:14–108:3.)  While the two accounts may be inconsistent with one in another, as the Court explains below, the inconsistencies do not require a finding that Rose, Jr.'s entire testimony was untrustworthy.

### b. Effect of the inconsistencies

The Court will now address Defendants' assertions that the inconsistencies make Rose, Jr.'s account of the events untrustworthy and the only credible account is Defendant McEntire's account.  (ECF No. 166-1 at 17.)  Simply put, Defendants are incorrect that the inconsistencies make the entire account untrustworthy.  First, as the Court noted above, the inconsistencies in Rose, Jr.'s two statements are not necessarily in complete conflict, except for Rose, Jr.'s description of how Defendant McEntire entered the home.  Even so, Rose, Jr.'s description of the fight was supported by the physical evidence and expert testimony at trial.

Rose, Jr. testified that Defendant McEntire tackled Johnathan into the wall and then hit Johnathan over the head while Johnathan was on his knees near the wall.  (ECF No. 166-8 at 133:7–11; 135:13–136:6.)  In contrast, Defendant McEntire testified Johnathan was standing ten to twelve feet from the wall and had thrown a punch at Defendant McEntire when the defendant hit him with the flashlight.  (ECF No. 176 at 723:23–724:11.)  Defendant McEntire testified Johnathan had fallen back into the wall after he was hit in the head.  (ECF No. 171 at 63:18–64:10.)  However, Plaintiffs' expert testified regarding blood spatter found near the hole in the wall Johnathan's body created upon impact.  Dr. Omalu testified the blood was "high momentum, high in nature of impact, it's what [is] called castoff blood spatter."  (ECF No. 172 at 300:15–17.)  According to Dr. Omalu, the splashing and pattern of the blood demonstrates someone was hit closer to the wall than ten to twelve feet away.  (ECF No. 172 at 301:15–302:13.)  Specifically, Dr. Omalu opined the hit would have occurred only one to three feet from the wall and the pattern was at a height consistent with Johnathan kneeling at the time of impact.  (ECF No. 172 at 302:15–22.)  Dr. Omalu's testimony supported the incident as recalled by Rose, Jr.  Defendants

offered no evidence of how castoff splatter came to be ten to twelve feet away from where Defendant McEntire stated he hit Johnathan. In fact, Defendants did not provide any explanation for the existence of the splatter on the wall near the hole. The Court also notes that Defendants did not refute Dr. Omalu's testimony in their motion, their reply, or during the trial.

As for the shooting portion of the incident, Rose, Jr. testified that as a result of the blow from the flashlight, Johnathan fell perpendicular across the bed. (ECF No. 166-8 at 137:6–10.) Defendant McEntire then jumped on top of Johnathan, straddled him and began punching Johnathan in the face and head. (ECF No. 166-8 at 139:5–9, 141:1–8.) After being struck about six times, Johnathan began to resist, push against, and fight against Defendant McEntire. (ECF No. 166-8 at 143:10–13.) After Johnathan began punching back, the pair rolled to the side so that Johnathan was on his right side and Defendant McEntire on his left, and continued fighting. (ECF No. 166-8 at 146:16–146:10.) The pair were still lying on their sides when Defendant McEntire shot Johnathan. (ECF No. 166-8 at 149:25–150:3.) Defendant McEntire testified Johnathan was straddling him and punching him repeatedly when Defendant McEntire shot him. (ECF No. 176 at 776:6–14.) In large part, Plaintiff's expert testimony at trial supported Rose, Jr.'s recounting of the shooting, although one such expert could not definitively say whether the trajectories demonstrated Johnathan straddled Defendant McEntire or laid next to him.

Rather than reiterating all of the evidence presented at trial, the Court will make three pointed observations. First, Defendant McEntire claimed Johnathan had struck him continuously while on the bed and explained he was worried about losing consciousness. (ECF No. 176 at 730:20–734:2.) He claims the fear of losing consciousness was what caused him to shoot Johnathan. (ECF No. 176 at 733:24–734:2.) However, Dr. Omalu testified that the images of Defendant McEntire's injuries to his face were not consistent with being punched as many times as Defendant McEntire claimed. (ECF No. 172 at 288:23–291:12.) Additionally, Dr. Fiore, the medical examiner, testified to a lack of corresponding injuries to Johnathan's hands that one would think to find on a person who repeatedly punched another. (ECF No. 175 at 610:3–14.) Next, McEntire's claim that he did not land a blow to Johnathan's face is contradicted by the photographs and Dr. Omalu's testimony. (*See* Trial Exs. 92, 93, 99, 100 & 101; ECF No. 172 at

291:18–293:4.) Specifically, Dr. Omalu testified Johnathan's "lips showed contusions to the upper and lower [lips] and a laceration and contusion of the frenulum of the upper lip. This is a pattern of trauma you see in an individual who's been punched violently on the lips." (ECF No. 172 at 292:25–293:3.) Dr. Omalu also testified "[t]here was another abrasion on the right side of his forehead, and then there were abrasions and contusions on the left side of [Johnathan's] neck. (ECF No. 172 at 307:2–4.) Finally, both Dr. Omalu, and Lance Martini — Plaintiffs' shooting reconstruction expert — agreed the physical evidence was more consistent with Rose, Jr.'s description of the positioning of the bodies. (ECF No. 174 at 352:15–25; ECF No. 172 at 226:4–227:1.)

Tellingly, Defendants do not contest this evidence in their reply, but instead reiterate the inconsistencies in Rose, Jr.'s two statements and assert the death of Rose, Jr. created sympathy and weighed heavily on the jury. Defendants claim "[t]here is no other reasonable explanation of excusing the deliberate attempt to change the scene presented to Deputy McEntire and to shift the blame from schizophrenia to the person called to save the day." The Court sat through the entire trial and it was abundantly clear that the evidence was against Defendants. The relatively small inconsistencies pertaining to Rose, Jr.'s movements prior to the arrival of the officer and the means in which Defendant McEntire entered the home do not in the Court's opinion change the scenario as to the actual confrontation between Johnathan and Defendant McEntire. Even if the Court were in doubt as to the aforementioned inconsistencies in Rose, Jr.'s description of the incident, neither the Court nor the jury need find his entire testimony is false. After sitting through the deposition testimony of Rose, Jr. and listening to Detective Tracey's testimony regarding his interview with Rose, Jr., the Court found Rose, Jr. quite credible.

Furthermore, the jury was instructed from the Ninth Circuit Model Jury instruction 1.14 on the credibility of witnesses. Jury instruction number 10 reads as follows:

> Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

22

> However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

(ECF No. 144 at 12.) Thus, the inconsistencies regarding the events leading up to the altercation and shooting do not necessarily require the jury to not believe everything that Rose, Jr. said. In fact, according to the jury instruction — taken almost verbatim from the model instructions — the jury may choose to not believe anything that witness says when the jury decides the witness "deliberately testified untruthfully about something important." The Court cannot say based on the evidence that Rose, Jr. deliberately testified untruthfully.[4] More importantly, the discrepancies deal with the time Plaintiffs waited for police to arrive and Defendant McEntire's entry into the home. There is nothing to suggest these details are "something important." Even assuming the Court found Rose, Jr. deliberately testified untruthfully about something important, the instruction permits the jury and the Court to choose whether to discredit Rose, Jr.'s entire account. There was certainly substantial physical evidence supporting Rose, Jr.'s account. The Court finds the physical evidence and expert testimony presented at trial supports the testimony of Rose, Jr. and the jury verdict. Accordingly, the Court denies Defendants' motion for a new trial under Rule 59(e).[5]

### IV. CONCLUSION

For the reasons stated above, the Court hereby finds as follows:

1. Defendants' Motion to Alter or Amend Judgement is hereby GRANTED, the judgement shall be altered to strike the award of two million dollars to the successors-in-interest of Theodore Rose, Jr.;

---

[4] Defendants assert they did not have a fair opportunity to cross examine Rose, Jr. on the inconsistencies. However, during Rose Jr.'s deposition Defendants asked him about his statement at the hospital and insinuated that he was not staying true to that account. The jury heard this portion of his deposition at trial. Even if this was insufficient cross, as the Court states infra, the discrepancies deal with actions taken by the father prior to the confrontation between Defendant McEntire and Johnathan. Thus, the Court cannot say they are important details.

[5] Defendants moved for a new trial under Rule 59(e) and 60(b). However, Defendants offer no analysis under Rule 60(b). Upon review of the arguments Defendants make in support of a new trial, the Court notes the only possible grounds for a new trial under Rule 60(b) is Rule 60(b)(6), "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). For the reasons stated above, the Court finds there is no justification for relief from judgment. Accordingly, Defendants' Motion for a New Trial under Rule 60(b) is similarly denied.

23

2. Defendants' Motion for Judgment as a Matter of Law is hereby DENIED as procedurally improper; and

3. Defendants' Motion for a New Trial is hereby DENIED.

The stay of judgment in this matter is hereby LIFTED and judgment shall take effect.

IT IS SO ORDERED.[6]

Dated: August 7, 2018

Troy L. Nunley
United States District Judge

---

[6] This Order resolves ECF No. 166 in its entirety.